We have two cases this morning, the first of which is No. 14-1327, Best Key Textiles Ltd. v. United States. Mr. Peterson. Thank you, Your Honor. May it please the Court. The Court of International Trade incorrectly applied the standard of review in determining whether customs revocation of Best Keys classification ruling was proper. And as a result, they reached a wrong determination on the merits in that ruling. And we brought this case to ask the Court to review the determination and set it aside. Now, in this case, Mr. Peterson, I've got some serious questions. Pages 7 and 8 and 45 in the blue brief. The appellant alleges customs personnel, quote, conspired, close quote, engaged in improper conduct, close quote, and the customs laboratory report was a forgery, close quote. Okay. Have those allegations been reported to the proper authorities? Well, I don't know if they are criminal allegations. They are certainly administrative violations. Is there a discrepancy in the agreement among two or more persons in an unlawful act or a lawful act in an unlawful fashion? I don't know if they were reported to the authorities, but in fact, if you look at page 109 of the appendix and you look at the significant contract report, you'll see that what started the revocation of the ruling was a laboratory report by the customs laboratory, which specifically detected the added aluminum, the added metal in our client's product. And our client at the time had a ruling saying that our product was a metallized yarn. What's the forgery about? Pardon? What's the evidence that there was a forgery? Well, if you take a look at what they say in 177.9, the lab report by customs shows the aluminum, page 107A, you can see the spike on the spectrographic chart. And in the lab report, they said three import specialists told the laboratory technician, quote, I should disregard ruling N187601 while writing the laboratory report. It was also decided that the laboratory report number, 20120156, will only state that the sample is wholly of polyester. So basically, the customs officials saw the metal in our client's yarn. They acknowledged the metal in our client's yarn. They said it was de minimis. Excuse me? They said it was de minimis. Well, they didn't say it was de minimis here, Your Honor. What they said here is they were going to disregard the ruling and report the product, report the answers if there were no metal in the product. Now, on the question of de minimis, consistent customs rulings, the harmonized system itself, the explanatory notes for the harmonized system, and even customs-informed compliance procedures and publications say metallized yarn is not required to contain any minimum amount of yarn, and that very often the amount of metal in a metallized yarn is quite small. This is particularly true with regard to Besky's yarn because we learned how to make it using nanometal particles, which has a higher surface energy per mass. Let's go back a minute and talk about the jurisdictional issue. Absolutely. Which seems to be significant and also standing. Why can't you bring this within A or potentially H by saying that you want to import a garment or actually import a garment and bring yourself under one of those sections for determination? Well, there's a couple of reasons. First of all, Your Honor, our client's harm does not lie in the assessment of higher duties on its customer's products. Our client's harm is a property interest that we had in the favorable ruling that we held. That ruling compelled customs to classify our product in a particular way. Now, we can't. Are you saying that customs is never allowed to change a classification ruling? Customs is allowed to change a classification ruling, but when they do, they are subject to judicial review to determine whether that change is arbitrary, capricious, or not in accordance with law. But it still has to injure you. The ruling on the thread of yarn actually favors you because it brings it under a classification with a lower duty. Your only interest in this case is that you say that that classification makes it more difficult for you to sell your yarn to garment makers, right? Well, yeah. Our interest is a business interest. Our client operated under the favorable ruling for two years. So your real interest is the classification of the garment, not the classification of the yarn, right? Well, we have a ruling on the classification of our yarn. No, no, no. What's the answer to my question? Your real interest is in the classification of the garment, not the classification of the yarn. No, the real interest is in the classification of our yarn. It may make the yarn more marketable to some customers because it yields a lower duty rate on garments. But best key is not making garments. So our interest is in the yarn. Well, then how are you injured with respect to the yarn since you've been brought under a duty classification with a lower duty? Well, that's the important point, Your Honor. You have to understand that the harmonized system is no longer used just to determine the classification of imported goods. When you get into things like free trade agreements and what have you, we're concerned not only with the classification of the imported goods, but often with the classification of the material that goes into the imported goods. So very often people will ask for a customs ruling to say, how do you classify this material that goes into a finished product? The person asking for the ruling is not going to import the finished product, but they're going to be making and supplying the material. And very often the question of how you classify the material affects whether the duty rate applicable to the finished product, and that affects the marketability of the input. But you don't even intend to import the yarn, right? We have not imported the yarn commercially. So you're talking about a product that you haven't imported, you don't intend to import, and that the reclassification benefited some who would ultimately import it. Well, the reclassification of yarn benefited nobody. It might have benefited somebody importing yarn. But the point was that we were doing business for two years under the favorable ruling that classified the product as metallized yarn. Why didn't you import the garment and challenge the garment classification? We're not a garment company, number one. But here's the thing about classifying a garment, saying I want to come in, and this is what the government says, you have to come in, import a garment, and get a classification ruling from the court officer. The problem with that is that that involves a different party, not the ruling holder but somebody else, different merchandise, not the yarn but the garment, a different decision rendered by a different customs officer or court officer. Well, that's exactly the point. We shouldn't be addressing the garment question as though it's somehow involved in the yarn because the relationship between the yarn classification and the garment classification is not clear at all. Well, Your Honor, it would be a pretty sad day for American administrative law where a company that holds a ruling from a government agency has that ruling revoked, loses over $200 million in business, as Besky did, and is told you don't have standing to challenge that determination. The protest mechanism never challenges the revocation of the ruling. It never challenges the illegalities that we've mentioned in the process for revoking the ruling. It never results in a review of the ruling itself. Mr. Pearson, let me back you up a little bit to the actual facts. In the amicus brief, Selmer says plaintiff appellant only advocates, so they're putting these words in your mouth, incorporating nanoparticles into a yarn to perform specific functions and provide specific properties such as superhydrophobicity, odor or mixture elimination, increased elasticity and strength, and bacterial resistance. Is that true? Yes, Your Honor. Nanoparticles do impart useful properties to textiles. There's a question, then. Where is it in the record? You can find all sorts of text references to that beginning at Part 156A of the record, and there's the application of the discussion of what nanotextiles do. They increase antimicrobial properties. I remember seeing that in your brief, and I'm looking for it in the record. 156? Well, the record includes a statement on that. But here's a point, though, Your Honor. I think what the government is saying is they're saying, well, what particular function does the metal perform in your product? And it does perform an antimicrobial function. Okay, and I'm not asking for this article. I'm asking for where in the record does it show that you're advocating incorporating nanoparticles in the yarn to perform specific functions and provide specific properties. I don't believe we have that in the record because it's not a condition of classification. No, no. I was looking when they said that. I was looking for it, and I couldn't find it. Okay, but if you look at the tariff, the provision for metallized yarn, all it requires is that the yarn be compliant with the metal. No. Okay, I've answered your question. You've answered my question. It's not there. Okay. But as a matter of law, I don't think it has to be there, Your Honor. I understand your argument. Okay. If the court's not satisfied, it could always remand for further fact-finding on this point. But here's the thing. We have a ruling procedure. Rulings are very important. They change the relationship between the ruling holder and customs. They limit the ability they're binding on customs officials throughout the United States. Somebody who has a ruling and is doing business under a ruling has an important property interest. Best he had that property interest. Where, as here... Suppose there had been no ruling here in the first place, and you were just coming in and saying customs is misclassifying this yarn, and it has this impact on our ability to sell to the garment manufacturers. Would there be jurisdiction if there had been no ruling revocation? Well, if there had been no ruling revocation, I don't think we would be aggrieved in fact, if that's Your Honor's question. So there would be no jurisdiction? No, but we did have a revocation. Yes, there would be no jurisdiction. If there was no revocation? If there was no ruling procedure? No, we wouldn't be here. Because if we were only dealing... My question is whether you'd be here. My question is if you came to court and there had been no ruling revocation, would there be jurisdiction to determine the classification of the yarn? We would not be an aggrieved party. There might be another aggrieved party who could say we dispute that classification. If somebody was in the zone of interest and felt that a favorable ruling to us hurt them, yeah, they could bring an action, I think. When you say a favorable ruling to you, I mean the customs will issue these New York rulings, as they call them, when there's a request, but that doesn't create a property right in the ruling to any particular party. Well, it does, and I think the court in the international customs products case sort of suggested that. In fact, I would commend to the court there's another pending international customs products appeal in the amicus brief in case number 14-16-44, speaks to that to some extent. The ruling request is favorable to us in that it tells us that our product is deemed effective by customs and marketable for one of the purposes that our customers want to buy the product for. As we said in the brief, it's as if we were the producer of a pharmaceutical ingredient making it abroad. So does that ruling, the fact that the ruling existed, would that benefit every metallized yarn seller? No, only the holder can rely on it under the customs regulations. But the important thing to understand, Your Honor, is that when you have a ruling, it changes the relationship between the ruling holder and customs. No longer does the port guy at customs, does that person, that guy or gal, have the ability to make a determination on classification under Section 177.9A of the regulations. The ruling, good or bad, is binding on that. Right, it's binding with respect to imports of that product. Well, it's binding, the position is also binding. So if we say, here's a garment, it's made with best key metallized yarn, the port person is required to treat the yarn as being a metallized yarn. And that's the important thing. Why are you asking me to challenge the decision of a customs port official when it's really not the port official's decision anymore? It emanates from the ruling. And that's why in this case, among all cases, it's proper to bring a direct challenge to the ruling under the Administrative Procedure Act. Okay, Mr. Peterson, you're in the public time, you want to save it here? Thank you. We'll give you two minutes or so. Ms. Farrell? Good morning, Your Honor. Your Honor, we believe that the trial court in December issued a correct decision. That decision was that there was no jurisdiction in this case. Upon reconsideration, it found jurisdiction. The jurisdiction that was found was found under I, and that jurisdiction should not have been found. What we have here is an importation ruling that never intended to be imported. So the product that was placed before customs... Other than presuming jurisdiction, what exactly was the court's rationale? The court's rationale in the February ruling, Your Honor, from what I read in it, is that it presumed jurisdiction because there had been a harm, and it believed that Beth Key was at most knowledgeable about its product to know whether or not it had in fact been harmed. So the court found jurisdiction under I-4. But the problem here is that you have someone who is never intended to import into the United States and is seeking a pre-importation ruling. A pre-importation ruling, by its very nature, anticipates that there will be an importation, and there never has been one. But it sounds kind of strange, though, that they got their pre-importation ruling, and it wasn't until you realized that you might be hurting domestic manufacturers of garments that you decided to rethink this ruling. Yes. What happened was, you're right, Your Honor, two months later there was the big reveal. The big reveal was, oh, we're never intending to import this yarn. We're actually working to get someone else to import something into the United States and get a reduction from a 32% tariff on polyester to 5% on other textiles. But I think what's telling is, if the court looks at the reply of Besky in footnote number two, it says, As the government notes, Besky is not a producer or importer of apparel, but a producer of material, yarn, used to make apparel. Besky's interest lies not in the payment or refund of duties on given merchandise, but in its ability to market its yarn as an effective material for use by customers who want to produce metallized yarn garments. So suppose that instead of attacking the yarn classification, they had said, we want a ruling about the proper classification of the garment. Would they be able to do that? Your Honor, not only were they able to do that, they did. Right. They sought a ruling on a garment called a Johnny Collar. It's a men's open-collared shirt. And that ruling was revoked, correct? That ruling was revoked, but not because, it didn't change. The initial ruling on the Johnny Collar was that the garment was not made of metallized yarn or other textiles, so therefore it was polyester. In doing that ruling, that's when they came across the problem of the initial yarn ruling. Customs believed that it was appropriate to back out the Johnny Collar ruling because they understood it was an implication of the yarn ruling. Suppose they had challenged the Johnny Collar ruling instead of the yarn ruling. Would there be jurisdiction here? Yes, Your Honor, because in that instance, when the Johnny Collar ruling is found to be not metallized yarn, the tariff is increased. I mean, they'd have to do an importation. Yes, Your Honor, they would have to do an importation. And their ability to bring in a sample to get a Johnny Collar ruling suggests that it would be pretty easy to bring in a sample as an importation. And more importantly, there's a lovely amicus here that could have done the same thing. That's what I was just going to ask. So Selmer could have done the challenge, but the challenge would have been under A? Yes, Your Honor. Or H, right? Well, would it be under H because Selmer hadn't been the person seeking the Johnny Collar ruling? So you could conceivably bring it under H if the Johnny Collar were causing irreparable harm. But only if you're the person who actually sought the ruling initially. But Best Key preempted everyone else because they're the ones. But an A is going to have priority anyway. Yes, under the structure of how Congress perceives the jurisdictional construct of the Court of International Trade, you always want something to come in under an A. The I jurisdiction is narrow. It's something that you don't want to reach if you're able to reach it another way. And the reason being is the situation that we're here today. You're forced to look at it from an administrative record, which is circumscribed. A court, you know, if we're talking about Jarvis-Clark in the pure classification context, 1581A case, under Jarvis-Clark, the court is going to compile as much information as possible because it wants to get the right decision. The court has the ability to remand and gain even more information. But in a context of an I action under the APA, it is constrained. It's limited to an administrative record. And not only is it limited to an administrative record, it is limited in its standard of review. It has to look at it from purely, they call it the most deferential standard to an agency. So if we were under A, what role could Best Key have played in A? How could they have participated in an A challenge? Best Key could have participated in an A action by instead of bringing the Johnny collar in as a sample, bringing the Johnny collar in as an import. Bring one import in. There won't be a large financial harm. To the extent they're able to show that somewhere in the background they have some harm, they might be able to get the court to expedite it or not. I mean, this case came in in August of 2013. It's now December of 2014. So it took time. It took time to work through. And the only result, even if this court were to get, to find jurisdiction and were to get into the merits and somehow find that the trial court misunderstood the standard of review, which it clearly did not, the next thing that would happen would be you would set aside and we would start all over. What's your understanding of why they didn't proceed under A with the importation of a garment? Your Honor, I am not entirely sure why they didn't proceed under A, but I do know that the Johnny collar ruling found the presence of 0.002% of metal in the fabric that was in the Johnny collar ruling, whereas in the yarn ruling it was found to be 0.7%. And I don't know whether the fabrication of garments using Besky's 0.7% yarn, whether that somehow does something to the yarn and destroys the metalized aspect of it and leaves a garment that has a 0.002%, which is mathematically two one-hundredths, one-hundred-thousandths. What's your response to the claim that the lab report was doctored? Judge Musgrave addressed this issue and he said he found it really, really difficult to believe that three people who worked for customs would conspire together. So he pretty much left that off. He found that just not possible. What we have here is in the lab report, there's a discussion. All of the documents that are associated with the lab report, all that information is there. Indeed, the only reason Besky is able to make... It's a pretty incompetent conspiracy. An incompetent conspiracy. The reason Besky can come before this court and even try to make these arguments is because in a FOIA request, they got everything that they're now pointing to. If I'm engaged in a conspiracy, I am not giving you those documents in a FOIA request. I'm going to hide them. How normal is it for customs to consult with domestic producers on an ex parte basis while they're considering these rulings? That's pro forma. They do it all the time because they're gathering information. Why is that questionable? In other contexts where agencies are engaging in adjudication or quasi-adjudication, in general, it's considered to be inappropriate to have ex parte contacts. Why is customs exempt from that? Are there cases that support your having those kinds of ex parte contacts? Your Honor, I'll stop in my head. I can't cite a case about ex parte contacts, but customs has a duty to understand. It's the expert in its field. It has a duty to understand the area that it's working in. That's not a reason to have ex parte contacts. It might be a reason to ask the domestic industry to comment in the open about it, to provide information, but to have ex parte meetings, that's not a justification for that. If it has ex parte meetings and is in fact seeking to have the domestics weigh in, that may be an ex parte meeting that's completely permissible. I don't see a problem with an ex parte meeting. Those meetings are provided for in the rules, are they not? I mean, I've seen... I'm not entirely sure, off the top of my head, Your Honor, where in the rules we would see that, but that customs is gathering information when it issues its ruling letter. There are no surprises. There's an open comment period, and it gathered information during that open comment period, but it also has to construe the tariff. Other agencies don't do that. They don't do that. They don't have ex parte meetings. They get comments. It's all on the public record. Everybody can comment on it. Well, Your Honor, this was public record. There was a 1625c notice and comment period. There were two different parties that commented, Besky being one, and the ruling letter itself explained. There's nothing about ex parte communications that is supporting that. Customs is looking to the tariff... No, but it had ex parte communications, right? I believe that there were... I believe customs reached out to the domestic industry, yes. I seem to recall about 18 or 19 years ago asking the same question Judge Dyke asked when I was on the new, on the Court of International Trade, and getting a tutorial on it from counsels, which is why I say I think it's in the rules, but it's been so long, it could have been Mr. Peterson who did it. I don't even know. I'm not sure, Your Honor, but if the court needs that information, I would respectfully request an opportunity to provide it after this hearing today. Well, if you want it, we'll ask for it. There's one other aspect of the government's position that seems to me highly questionable, and that's the suggestion that in reviewing the ruling, we do it on an arbitrary and capricious basis rather than determining whether the ruling came to the right conclusion as to the classification. I don't understand that. I mean, the question is whether the determination that this came under one heading rather than another is a legal question, and the question is whether customs got it right or didn't get it right. But that legal question is not before the court procedurally. That's a different question. Right, but even this court, in looking at this case, this court is called to look at what the trial court did and whether or not the trial court erred in following the arbitrary and capricious most deferential standard. No, no, no, no. The question is should the trial court have looked at the classification de novo since the classification is a legal question rather than asking whether customs classification in the ruling was arbitrary or not. The question is whether it was correct or not, right? No, no, Your Honor. No? Not at that level. The correctness is whether or not the process conducted by customs and the information that was gathered, whether it supports. The court is not to supplement its own opinion. I think you're quite wrong about that. But your point, I thought, from your brief, was that yes, if we were under A, then it is de novo review. Yes. But because we're under I, they can't have it both ways. So they can't get de novo review under I if they want to proceed under I. That's correct, Your Honor. The standard of review is different under I than it is under A. A is de novo review. I don't think there's any case that suggests in reviewing a ruling that the question of whether the classification is correct or not  it's a legal question. You're right, Your Honor. However, as this court has said time and time again, that the classification of goods is a two-step process. Part of that is legal and part of that is factual. Imbued in the classification is fact. And you cannot conduct a de novo review out of an administrative record and gather all the facts that would be somehow different. So that is why, procedurally, the way it's reviewed is whether or not it's arbitrary, capricious, or otherwise contrary to law. Otherwise contrary to law can't be that you have to get the classification that the other side wants if you don't do it that way. It's contrary to law. If that were the case. So you're just asking for deference on the factual aspect of it. On the factual aspect of it as well as on the legal aspect because the legal. I don't understand the idea of deference on the legal aspect. The legal question is a legal question. I'm not aware of any other context where there's deference to an agency on a legal question. Well, there can be deference to the agency where the facts come in. To the extent we're looking at this to see whether or not it's otherwise contrary to law. This is not a full-blown litigation where the court is going through all the information possible. This is a circumscribed universe. And so the court, in looking at it, looking to see whether or not it's contrary to law, that arbitrary and capricious standard plays into that to see whether or not it's not possible for customs to have reached that conclusion based on the facts. I don't understand that. And I think there's no support for that. But that may or may not have any relevance here. Again, I think the fundamental issue here is whether or not there's jurisdiction. And given that you have, essentially, a pretextual pre-importation ruling that's dealing with yarn, you have harm overseas dealing with garments and manufacturers who want to buy yarn. The manufacturers overseas do not care how that yarn has been classified. They only are concerned with the garment, which is why Besky brought in a sample Johnny Collar. And that's how this whole matter got started in the first place. Your Honor? Let me just ask you one final thing. When I was thinking about the question Judge O'Malley asked, my reaction was, well, they could turn it on their head and the amicus could have done the importation and then Besky would have been the amicus. But is it possible that they could have jointly filed an action? I don't know that, and I'm curious if you do. Under A for the Johnny Collar? Yeah. I don't believe that they could file it under A under the Johnny Collar because Besky would have no importation. They weren't doing the importing. But I'm sure they could come in as an intervener and claim that somehow they're being affected, or at minimum, as your Honor suggests, as an amicus. So potentially they could intervene. It would depend on whether the court felt that they had a high enough standard to. But the court could also drop it to the lower level and say, I may not find you worthy of being an intervener, but surely I would like to hear from you as an amicus. And so Besky would have an opportunity to be heard and to make sure that the court had a full amount of information to get a decision, and to get a decision under the right standard, which is under 1581A, because that's what Congress contemplates when we're looking for the absolute correct classification of a good. Yeah, and at that point under Jarvis Clark, the court has a lot of leeway to gather information. Yes, your Honor, that is true. Thank you very much, Your Honor. Mr. Peterson, you've got two minutes. Thank you. Could you tell us what problem would exist for you going under A? Yes, there's a problem with going under A, because A never results in a determination as to whether the ruling that we're challenging is correct or not. It results in a determination of the correctness of a decision of a court official. Why isn't that sufficient? Well, in this case, the court officials... Well, the problem is that decision never directly challenges the ruling and whether the ruling is pursuant to the APA standard. It never gets there. What the government is asking you to do is they're saying, Congress set up 1625. They told the holders of ruling like Besky, you have a right not to have your ruling changed on you without prior notice, opportunity to comment, and published determinations on a record. We've had that here. The government is asking you to hold that the decision from that process is not judicially reviewable. Well, it's reviewable, just not through you and not through this provision. Well, why would we bother to compile a record in front of customs if it's never going to be looked at, if it's never going to be reviewed? When you get into a 1581A decision, the role of a ruling is very different. It's entitled to perhaps Mead deference or Skidmore deference, but you are not looking at the ruling. For example, there would be no way for a court in a case to look at all the procedural irregularities in the revocation process that we've talked about. The lab report, the improper ex parte contacts, all of that would go by the board if you hold that these determinations are judicially unreviewable. That's the real problem here. These are reviewable. Now, as to the standard review... But isn't the real point here what the correct classification is? Isn't that what you want to get to? Well, yes, and to answer your question, Judge O'Malley, the standard, the legal standard in this case is exactly the same as under an A case. Is it correct as a matter of law? The law is the harmonized tariff schedule. Now, you have to ask, what kind of discretion does the law give the administrator? The HTS gives none. It says, just like Jarvis Clark, find the correct answer. There's a whole bunch of chapter notes, section notes, tie breakers. If you get down to two options, both of which seem absolutely logical, rational, the law doesn't say, pick the one that the administrator, the customs administrator picks. It says, general rule 3C, pick the one last in numerical order. There's no discretion in the statute. So you can decide the classification issue on this record or on another record. It's going to be the same facts, and it's going to be the same standard review. Okay. Mr. Peterson, thank you. I think we're out of time. Thank you.